IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

PATRICIA LYNN HARDEE,

      Plaintiff,

v.                                  Case No.: 3:20-cv-00212

ANDREW M. SAUL,
Commissioner of the
Social Security Administration,

      Defendant.

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB"), supplemental security income ("SSI"), and disabled widow's benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in his favor. (ECF Nos. 14, 15).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for

judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

Patricia Lynn Hardee ("Claimant") protectively filed for DIB and SSI on March 7, 2017 and disabled widow's benefits on June 5, 2017, alleging a disability onset date of December 31, 2010 due to the following medical conditions: "herniated disc in neck, back, [and] knees." (Tr. at 15, 341-62, 378). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 15). Claimant requested an administrative hearing, which was held on March 8, 2019 before the Honorable Toby J. Buel, Sr., Administrative Law Judge ("the ALJ"). (Tr. at 40-69). On March 26, 2019, the ALJ issued a written decision, finding that Claimant was not disabled as defined by the Social Security Act. (Tr. at 12-33). The ALJ's decision became the final decision of the Commissioner on January 27, 2020 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 12, 13). Claimant filed a Brief in Support of Judgment on the Pleadings, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 14, 15). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 44 years old on her alleged onset date and 52 years old on the date of the ALJ's decision. (Tr. at 26). She communicates in English, obtained a general

education diploma (GED), and previously worked as a fire restoration technician and laborer. (Tr. at 45, 377, 379).

### III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this

determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration,

persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2013 and the non-disability requirements for disabled widow's benefits through May 31, 2024. (Tr. at 18, Finding Nos. 1 through 3). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since December 31, 2010, the alleged disability onset date. (*Id.*, Finding No. 4). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease, arthropathies, depression, anxiety, and somatic symptom disorder." (*Id.*, Finding

No. 5). The ALJ considered Claimant's migraines, acute bronchitis, loss of vision, and left mid-forearm laceration with tendon involvement on the volar aspect, but the ALJ found that the impairments were non-severe. (Tr. at 18).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 18-20, Finding No. 6). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can never climb ladders, ropes, or scaffolds; she can frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. She can frequently handle, finger, and feel. She must avoid all exposure to hazards, such as unprotected heights and moving machinery; she can tolerate frequent exposure to extreme cold and extreme heat. Additionally, the claimant can perform no more than simple, routine, repetitive tasks in a low-stress job, defined as involving no strict production or time quotas, and with no more than occasional change. The claimant experiences symptoms of chronic pain, noticeable at times, but she can maintain attention and concentration in two-hour increments with normal morning, lunch, and afternoon breaks.

(Tr. at 20-26, Finding No. 5).

At the fourth step, the ALJ determined that Claimant was unable to perform her past relevant work. (Tr. at 26, Finding No. 8). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in other substantial gainful activity. (Tr. at 26-27, Finding Nos. 9 through 12). The ALJ considered that (1) Claimant was born in 1966 and was defined as a younger individual on the alleged onset date, but subsequently changed age category to an individual closely approaching advanced age; (2) Claimant had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was

"not disabled," regardless of her transferable job skills. (Tr. at 26-27). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as a house cleaner, mail room clerk, or cafeteria attendant. (Tr. at 27). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 27, Finding No. 13).

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant asserts two challenges to the Commissioner's decision. First, she argues that she was denied her procedural due process rights when the ALJ failed to rule on her pre-hearing motion that objected to the use of Haddon Alexander, III, M.D., as a medical expert in her case. (ECF No. 14 at 9-10). Second, she contends that the ALJ erred in giving great weight to the testimony of Dr. Alexander in the RFC assessment. (*Id.* at 11-15).

In response to Claimant's challenges, the Commissioner asserts that Claimant has not proven that she is disabled under the Social Security Act, the ALJ properly ruled on Claimant's objection regarding Dr. Alexander, and substantial evidence supports the ALJ's RFC finding. (ECF No. 15 at 12-20).

## V.    Relevant Evidence

The undersigned has reviewed all of the evidence before the Court. The information that is most pertinent to Claimant's challenges is summarized as follows:

### A. Treatment Records

Claimant was regularly treated by a neurologist, Samer Nasher, M.D., during the relevant period. From June 21, 2010 through March 17, 2011, she complained of neck, back, and shoulder pain, and Dr. Nasher diagnosed Claimant at various times with neck

and back pain and carpal tunnel syndrome. (Tr. at 502-09). Dr. Nasher ordered an EMG study, which was performed on June 21, 2010. It was an incomplete study due to Claimant's discomfort, but it noted that there was no definite evidence of acute right median or ulnar neuropathy. (Tr. at 728).

Claimant again presented to Dr. Nasher on April 26, 2011, complaining of low back pain. (Tr. at 510). There were no abnormalities in Dr. Nasher's examination of Claimant's back, extremities, musculoskeletal system, and neurological findings. (Tr. at 511). Dr. Nasher diagnosed Claimant with neck pain, low back pain, and headache. (*Id.*). He renewed her prescription for Percocet and added Inderal and Klonopin to her medication regimen. (Tr. at 512). During Claimant's appointments with Dr. Nasher on May 25, 2011 through October 20, 2011, Claimant complained only of neck pain that radiated into her arms, but Dr. Nasher continued to note Claimant's diagnosis of low back pain. (Tr. at 513-29).

On November 21, 2011, Claimant related to Dr. Nasher that she was beginning to have low back pain because she was helping lift her father, who was ill. (Tr. at 530). She similarly stated to Dr. Nasher on December 19, 2011 that she began experiencing low back pain after she started caring for her father, a job which required lifting. (Tr. at 533). She also continued to complain of neck pain, which she stated caused numbness in her hands. (*Id.*). There were no issues in her musculoskeletal or neurological examinations. (Tr. at 534). Nonetheless, Dr. Nasher diagnosed Claimant with low back pain and lumbar radiculitis and prescribed medications. (Tr. at 534-35). On January 19, 2012, Claimant advised Dr. Nasher that she had increased constant low back pain that was radiating to her legs because she was "lifting a lot at work." (Tr. at 536). Like previous appointments, there were no issues in Claimant's physical examination concerning her back. (Tr. at 537).

Dr. Nasher continued to prescribe medications. (Tr. at 538).

Claimant followed up with Dr. Nasher on February 13, 2012. She complained of daily low back pain, neck pain radiating into her shoulder, numbness in her fingers and hands, and burning in her feet. (Tr. at 539). She advised that medications provided moderate relief. (*Id.*). There were still no issues on examination, and Claimant's prescriptions were renewed. (Tr. at 539-40). On March 13, 2012, Claimant reported neck and back pain and burning and tingling in her feet and hands. (Tr. at 542). She told Dr. Nasher that medication continued to provide moderate relief. (*Id.*). She also confirmed that she was still able to perform her activities of daily living. (*Id.*). On examination, Dr. Nasher noted cervical spasms, but no misalignment, tenderness, joint swelling, abnormal findings in her extremities, or focal motor or sensory deficits. (Tr. at 543). He refilled Claimant's medications. (Tr. at 544). There was relatively no change during Claimant's subsequent three monthly visits with Dr. Nasher. (Tr. at 545-53).

On June 15, 2012, Claimant presented to Charleston Area Medical Center ("CAMC") with a 3 to 4 centimeter laceration on her left forearm with exposed tendon. (Tr. at 1071-72). She reported that she was moving into a new house and cleaning up chunks of glass when a piece of glass lacerated her forearm. (*Id.*). She retained full extension, flexion, abduction, and adduction in her left hand. (Tr. at 1072). Claimant underwent surgery to repair the affected tendons. (Tr. at 1068). She advised Dr. Nasher on July 12, 2012 that she lacerated her arm "at work" and had surgery, but she stated that she was "doing ok now." (Tr. at 554). Claimant's physical examination was normal other than muscle spasm, and she was continued on her treatment course. (Tr. at 554-56). There was no significant change during Claimant's subsequent monthly visit with Dr. Nasher on August 13, 2012. (Tr. at 557-59). On September 12, 2012, Claimant complained

to Dr. Nasher that her left arm was still hurting daily, and her low back pain was worse when she was working and lifting her father. (Tr. at 560). She also reported neck pain. (*Id.*). Dr. Nasher did not document any abnormalities in Claimant's physical examination, and he renewed her medications. (Tr. at 561). Dr. Nasher noted the same findings and treatment course through March 13, 2013. (Tr. at 562-74). On April 8, 2013, Claimant told Dr. Nasher that she was lifting bags of mulch, which increased her back pain. (Tr. at 576). Dr. Nasher's normal examination findings and treatment plan continued through December 3, 2014. (Tr. at 576-632).

On December 6, 2014, Claimant was examined in the CAMC Teays Valley Emergency Department after she struck a deer with her car. (Tr. at 467). She was diagnosed with an acute cervical strain, chronic neck pain, and lumbosacral strain. (Tr. at 468). Her CT scans showed some degenerative changes in her cervical spine and scoliosis and minimal degenerative disease in her lumbar spine. (Tr. at 470-71). Claimant presented to Dr. Nasher monthly from January 5, 2015 through March 21, 2016. (Tr. at 633-678). There were no significant abnormalities in Dr. Nasher's examination findings, including no misalignment, joint swelling, or gross focal or sensory deficits, and Dr. Nasher continued to treat Claimant with prescription medications. (*Id.*). During one of those visits, on August 4, 2015, Claimant advised Dr. Nasher that she worked for her friend by helping care for her friend's "dying husband" and helping the friend move after her husband died.

On April 3, 2016, Claimant was again examined at CAMC after a motor vehicle accident. (Tr. at 448). She reportedly lost control of her vehicle and struck a tree. (*Id.*). She admitted that she had been drinking alcohol prior to the accident, and her blood alcohol content was 268 mg/dL (0.268 percent). (Tr. at 448, 449). Her CT scan showed

10

left-sided traverse fractures at L2 through L4. (Tr. at 464). She presented to the emergency department at St. Mary's Medical Center ("SMMC") three days later, complaining of moderate pain in her left hip and knee since the accident. (Tr. at 739). She told the providers at SMMC that the motor vehicle crash occurred because she swerved to avoid a deer and was pinned against a tree. (*Id*.). On examination, Claimant's neck was non-tender, and she denied pain on range of motion testing. (Tr. at 740). Claimant reported mild tenderness in her back, but she exhibited normal range of motion. (*Id*.). She had mild swelling in her left knee with decreased range of motion, and her left knee x-ray showed fracture of the lateral tibial plateau highly associated with internal derangement and ACL tears, small effusion, and soft tissue swelling. (*Id*.). A follow-up MRI was recommended. (*Id*.). The provider prescribed Norco and provided a knee brace. (*Id*.). On the same date, April 6, 2016, a hospital representative for SMMC wrote a note that Claimant was limited to no strenuous activity and no weight bearing. (Tr. at 478). Claimant continued to care for her father, as Dr. Nasher noted in Claimant's clinical record on June 30, 2016. (Tr. at 688).

On October 24, 2016, Claimant presented to Pleasant Valley Hospital, stating that she hit a deer with her car the previous day and suffered low back, left forearm, neck, and right knee pain. (Tr. at 492). Her lumbar x-ray showed mild to moderate dextroscoliosis and generalized mild degenerative changes, but no fracture or subluxation. (Tr. at 483). Her cervical spine x-ray reflected mild cervical spondylitic changes at C5-6, but also no fracture or subluxation. (Tr. at 482). The x-ray of Claimant's left knee demonstrated possible joint effusion, but it was otherwise an unremarkable examination. (Tr. at 486). Finally, the x-ray of Claimant's left forearm was normal. (Tr. at 484). On examination, Claimant had swelling and tenderness in her left upper extremity and right lower

extremity, but her gait, range of motion in her spine and extremities, stability, and muscle strength were all normal. (Tr. at 495). Claimant continued to follow up with Dr. Nasher monthly through February 2017. She expressed various complaints, but Dr. Nasher recorded on her physical examination that she had no misalignment, joint swelling, gross focal or sensory deficits. (Tr. at 700-16, 796-814)

On April 29, 2017, Claimant presented to SMMC, complaining of left-sided neck and arm pain. Claimant stated that the symptoms persisted for years, but they worsened that week and caused tingling in her fingers. (Tr. at 732). She explained that she slept on her neck "wrong" one night and it hurt ever since. (*Id.*). On examination, Claimant reported mild cervical tenderness to palpation and had muscle spasm, but no focal deficits and intact sensation. Her cervical spine x-ray showed spondylosis. (Tr. at 738). Claimant became disgruntled because she did not receive the treatment that she requested. She asked for Dilaudid, a narcotic medication, by name, stating that a "pain shot" worked in the past, but the provider insisted that a steroid was the appropriate treatment for her chronic pain. (Tr. at 732, 734, 735).

The following day, Claimant went to Teays Valley Hospital, expressing the same complaints. (Tr. at 749). The provider noted that Claimant's x-rays at SMMC the previous day were unremarkable and she was prescribed steroids, but Claimant said the steroids were not helping. (*Id.*). On examination, Claimant appeared to be uncomfortable, but she was active and alert, had normal gait, moved her upper and lower extremities equally well, and demonstrated no apparent gross neurological deficits. (Tr. at 750). She was prescribed Norco. (Tr. at 749).

On October 9, 2017, an x-ray of Claimant's lumbar spine showed scoliosis with mild to moderate degenerative changes at L5-S1 with no compression fracture. (Tr. at

777). Claimant also had straightening of her cervical spine with moderate degenerative disc disease at C4-6. (*Id*.). The following year, on February 15, 2018, Claimant presented to Nurse Practitioner, Neesha Smith, regarding left wrist pain. (Tr. at 1051). Nurse Smith noted that Claimant had swelling in the area, a well healed scar on her forearm, pain with palpation and range of motion testing, and decreased sensation. (Tr. at 1053). However, there was no evidence of muscle atrophy, and Claimant's sensation and reflexes were intact. (Tr. at 1052). Nurse Smith diagnosed Claimant with hand pain and tendonitis of the left wrist. (Tr. at 1054). She administered a DeQuervain's Injection. (*Id*.). An x-ray of Claimant's left hand and wrist showed no bony abnormalities. (Tr. at 1050).

### B. Evaluations and Opinions

On July 13, 2017, Narenda Parikshak, M.D., stated that Claimant failed to attend her consultative examination and failed to cooperate. (Tr. at 90). Thus, Dr. Parikshak assessed that there was insufficient medical evidence to provide an RFC opinion. (*Id*.). Jimmy Adkins, P.A., subsequently performed an Internal Medicine Examination of Claimant on October 9, 2017. Claimant ambulated with normal gait and appeared comfortable in the supine and sitting positions. (Tr. at 773). She could write and pick up coins with either hand without difficulty, but her left hand grip strength was mildly reduced at 4/5 due to true muscle loss. (*Id*.). She had limited dorsiflexion and palmar flexion of her wrists graded at 45 and 50 degrees, as compared to normal range of motion of 60 degrees and 70 degrees, respectively. (Tr. at 776). However, Claimant's radial deviation and ulnar deviation in her wrists were normal. (*Id*.). Claimant complained of tenderness to palpation in her left knee, but there was no swelling, redness, warmth, laxity, or crepitus, and she had full range of motion and denied any pain with range of motion testing. (Tr. at 773, 776). Claimant's straight leg raising test in the supine position

was positive at 90 degrees bilaterally for pain in the lower back radiating to her lower extremities. (Tr. at 774). Yet, her muscle strength was 5/5 in her lower extremities, there was no evidence of atrophy, and her deep tendon reflexes and sensation were well preserved, including sensation to pinprick, light touch, and vibration. (*Id*.). Claimant could stand on one leg, walk on her heels and toes, squat, and perform tandem gait without difficulty. (*Id*.). She also had full range of motion in her dorsolumbar spine. (Tr. at 776). P.A. Adkins's impression was that Claimant suffered from herniated discs, osteoarthritis, and arthralgia. (Tr. at 774).

On October 30, 2017, Palle Reddy, M.D., assessed Claimant's RFC based upon his review of Claimant's records. Dr. Reddy opined that Claimant could perform work at the light exertional level with occasional climbing of ladders, ropes, or scaffolds and otherwise frequent postural activities. (Tr. at 119-20). Dr. Reddy further assessed that Claimant should avoid concentrated exposure to extreme temperatures and hazards. (Tr. at 120-21).

### C. Claimant's Statements

Claimant testified during her administrative hearing on March 8, 2019 that she drove approximately 50 to 80 miles per week. (Tr. at 58). Her typical daily activities included spending time with her elderly parents, performing personal hygiene and light household chores, preparing simple meals, and shopping weekly for one to two hours. (Tr. at 59-60). She stated that she had stabbing and burning pain in her neck, shoulder, and left hip of varying duration two to three times per week. (Tr. at 61). However, Claimant testified that gabapentin eased her symptoms. (*Id*.). Claimant was reportedly wearing a back/neck brace during the hearing, which she stated she was given one year earlier. (Tr. at 62).

14

## VI.    Standard of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.    Discussion

Claimant argues that the ALJ failed to rule on her objection to the use of Dr.

Alexander as a medical expert and improperly weighed Dr. Alexander's opinions in the RFC assessment. Each argument is considered below, in turn.

### A. Objection to Dr. Alexander's Testimony

Claimant asserts that the ALJ violated her due process rights by not ruling on her pre-hearing motion, which objected to the use of Dr. Alexander as a medical expert due to his potential bias. (ECF No. 14 at 10). She cites 20 C.F.R. §§ 404.939, 416.1439 and Rules I-2-2-20 and I-2-5-30 of the Hearings, Appeals, and Litigation Law Manual ("HALLEX"). The foregoing regulations provide that a claimant must notify the ALJ in writing of any objection(s) to the issues to be decided at his or her administrative hearing no later than five business days prior to the hearing, and the ALJ will make a decision on the objection(s) at the hearing or in writing before the hearing. 20 C.F.R. §§ 404.939, 416.1439. It is unclear why Claimant cites the regulations, as HALLEX I-2-2-20 provides that any objections to the testimony given by a witness, such as Claimant's objection to Dr. Alexander's testimony, do not fall within the scope of §§ 404.939, 416.1439. Therefore, given the fact that 20 C.F.R. §§ 404.939, 416.1439 do not apply to Claimant's objection to the use of Dr. Alexander as an expert, the undersigned turns to Claimant's argument that the ALJ violated HALLEX rules.

Under HALLEX I-2-5-30, a Claimant "may state objections to the expert based on perceived bias or lack of expertise," and "[t]he ALJ will respond to any objections, either in writing or on the record at the hearing." However, HALLEX is merely an internal manual that provides guidance to SSA staff. The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has not ruled that HALLEX confers procedural due process rights to claimants, as Claimant suggests. Rather, district courts within the Fourth Circuit have held that HALLEX does not carry the "force of law" and violations of the

manual are not a basis for remand. *See, e.g., Yoakum v. Comm'r of Soc. Sec.*, No. 1:14-CV-00074, 2015 WL 1585745, at *22 (N.D.W. Va. Apr. 9, 2015); *Pearson v. Colvin*, No. 2:14-CV-00026, 2015 WL 3757122, at *31 (N.D.W. Va. June 16, 2015); *Rogers v. Berryhill*, No. 5:17CV27, 2018 WL 1308952, at *4 (W.D.N.C. Mar. 13, 2018); *Looney v. Berryhill*, No. 3:17-CV-00450 (DJN), 2018 WL 3826778, at *13 (E.D. Va. Aug. 10, 2018); *Landrum v. Berryhill*, No. 1:17-CV-00940, 2019 WL 718550, at *7 (M.D.N.C. Feb. 20, 2019), *report and recommendation adopted,* 2019 WL 1532219 (M.D.N.C. Mar. 18, 2019); *Wilks v. Saul*, No. 1:19-CV-00306-MR-WCM, 2020 WL 5235335, at *5 (W.D.N.C. Sept. 2, 2020); *Cavers v. Colvin*, No. CIV. TMD 13-632, 2014 WL 4662515, at *7 (D. Md. Sept. 17, 2014); *Patterson v. Berryhill*, No. 9:17-CV-1899-MBS-BM, 2019 WL 1198550, at *6 (D.S.C. Mar. 14, 2019), *aff'd sub nom. Patterson v. Comm'r of Soc. Sec. Admin.,* 805 F. App'x 208 (4th Cir. 2020). Interestingly, Claimant asserts a due process violation relating to the use of Dr. Alexander as a medical expert, yet she did not cross examine Dr. Alexander when given the opportunity at the administrative hearing. (Tr. at 53).

Regardless, the ALJ very clearly complied with HALLEX in this instance. Claimant's counsel wrote a letter to the ALJ on March 4, 2019, four days prior to Claimant's administrative hearing. She stated that Dr. Alexander, the medical expert scheduled to testify during the hearing, recently "may have testified falsely regarding an inappropriate comment which was made during Counsel's opening statement" in an unrelated case. (Tr. at 444). Claimant's attorney further explained that her firm intended to pursue a complaint with the Regional Office concerning the incident with Dr. Alexander. (*Id.*). On that basis, Claimant objected to the testimony of Dr. Alexander in her case. (*Id.*). She clarified that she did not object to Dr. Alexander's qualifications as a medical expert, but rather, she objected to his credibility and the reliability of any

17

testimony that he might provide. (*Id.*). During Claimant's administrative hearing, the ALJ very clearly acknowledged Claimant's objection and overruled it on the record. (Tr. at 45). Although the ALJ erred in referring to the objection letter as Exhibit 15D instead of Exhibit 15E, the ALJ very plainly referenced Dr. Alexander in the directly preceding sentence. Therefore, the ALJ indeed complied with HALLEX I-2-5-30. The ALJ reiterated in his decision that he noted and overruled Claimant's objection. (Tr. at 28). Claimant fails to cite to any other authority that the ALJ was obligated to investigate Dr. Alexander's alleged bias or respond to the objection in a different manner.

For those reasons, the undersigned **FINDS** that the ALJ properly considered and ruled on Claimant's objection to the use of Dr. Alexander as a medical expert.

### B.  *Weight of Dr. Alexander's Opinion*

Claimant next challenges the great weight that the ALJ afforded to Dr. Alexander's testimony in the RFC assessment. When evaluating a claimant's application for benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(1), 416.927(a)(1).

The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. Unless an ALJ gives controlling weight to the medical opinion of a treating source, the ALJ must consider the following factors in deciding the weight to give to any medical opinion: (1) examining

18

relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion (hereinafter collectively "the regulatory factors"). *Id.* §§ 404.1527(c), 416.927(c).[1] As relevant to Claimant's challenges, the third factor concerning supportability states that the ALJ will give more weight to an opinion that presents relevant evidence in support, such as medical signs or laboratory findings, and provides a better explanation for the opinion. *Id.* §§ 404.1527(c)(3), 416.927(c)(3). The regulations explain that "because nonexamining sources have no examining or treating relationship with you, the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions." (*Id.*).  Regarding the fourth factor, consistency, the ALJ will give more weight to a medical opinion that is more consistent with the record as a whole. *Id.* §§ 404.1527(c)(4), 416.927(c)(4).

In this case, the ALJ gave great weight to the RFC opinion of Dr. Alexander that Claimant could perform a limited range of light work. (Tr. at 24). Claimant contends that "the ALJ's written decision contains no discussion of [the factors listed in 20 C.F.R. §§ 404.1527(c), 416.927(c)]  as they related to [Dr.] Alexander's opinion, and without such discussion, the ALJ has no substantial evidence to support his ultimate RFC finding, given that the record supports a higher degree of limitation." (ECF No. 14 at 11). According to Claimant, two of those factors were critical because Dr. Alexander's opinion purportedly lacked supportability and consistency. (*Id.*). Claimant identifies the ways in which she contends that Dr. Alexander's testimony was inconsistent with her medical records regarding her back, left knee, and left wrist impairments. She also argues that Dr.

---

[1] These rules apply to claims filed before March 27, 2017. Claimant's DIB and SSI applications were protectively filed on March 7, 2017. (Tr. at 15).

Alexander's RFC opinion was unsupported by substantial evidence because it encompassed such an extended duration of time without any apparent change in Claimant's functional abilities. Again, it is curious that Claimant did not cross examine Dr. Alexander during her administrative hearing regarding these issues, the supposed lack of supportability or inconsistencies in his testimony. Regardless, the undersigned evaluated each of Claimant's challenges as follows.

### 1. Back

Dr. Alexander testified regarding the traverse lumbar fractures that Claimant suffered in a motor vehicle accident in April 2016. (Tr. at 48); *see* (Tr. at 464). Dr. Alexander stated that he did not find any significant findings regarding Claimant's back after that injury. (Tr. at 48). He noted that Claimant's primary care physician, Dr. Nasher, discussed scoliosis, but found no deformity, tenderness, or malalignment of her spine. (*Id.*). Finally, Dr. Alexander testified that Claimant's lumbar x-ray in October 2017 showed scoliosis, but there was no evidence of radiculopathy. (Tr. at 50); *see* (Tr. at 777).

Claimant argues that the above testimony was inconsistent with her October 2016 and October 2017 x-rays showing degeneration and scoliosis and her October 2017 consultative examination findings that noted a positive supine straight-leg raising test at 90 degrees and a diagnosis of herniated discs. (ECF No. 14 at 11-12). However, the undersigned finds that Dr. Alexander's testimony regarding Claimant's back impairments, and the ALJ's reliance thereupon, is supported by substantial evidence. Dr. Alexander emphasized that there was no further evidence of lumbar fracture, and there was an absence of objective evidence to suggest radiculopathy. He discussed that Dr. Nasher's records lacked any significant examination findings in that regard.

The medical evidence that Claimant cited does not refute Dr. Alexander's above testimony. Rather, Claimant offers cites piecemeal portions of the records and invites the Court to re-weigh the evidence and reach different conclusions than the ALJ. The undersigned declines to do so because more than a scintilla of evidence supported Dr. Alexander's opinion. To summarize, Claimant's October 2016 and October 2017 lumbar x-rays showed scoliosis, non-severe degenerative changes, and no fracture or subluxation precisely as Dr. Alexander testified. (Tr. at 483, 777). Claimant is correct that P.A. Adkins noted during Claimant's October 2017 consultative examination that Claimant had a positive supine straight leg raising test, and it was his impression that Claimant suffered from herniated discs, osteoarthritis, and arthralgia. (Tr. at 774). However, P.A. Adkins's examination findings also confirmed that Claimant's muscle strength was 5/5; there was no evidence of atrophy; her deep tendon reflexes and sensation was well preserved, including sensation to pinprick, light touch, and vibration; she could stand on one leg, walk on her heels and toes, squat, and perform tandem gait without difficulty; and she had full range of motion in her dorsolumbar spine. (Tr. at 774, 776). Notably, Dr. Nasher's objective findings also consistently documented no gross focal motor or sensory deficits or malalignment through February 2017. (Tr. at 797-1033). In sum, the record substantially supports Dr. Alexander's testimony that there were no significant findings related to Claimant's back following her lumbar fractures, and there was no objective evidence regarding radiculopathy or more severe symptoms or limitations.

### 2. Left knee

Dr. Alexander testified that Claimant suffered a small displaced fracture of the lateral tibial plateau in the April 2016 accident, but he explained that there was no further reference to fracture of that knee. (Tr. at 51-52); *see* (Tr. at 740). Further, Dr. Alexander

stated that Claimant's October 2017 consultative examination noted some tenderness and pain in her left knee, but Claimant did not have any issues such as crepitus, laxity, fusions, or swelling. (Tr. at 49, 51); *see* (Tr. at 773, 776). Therefore, Dr. Alexander found no evidence of residual impairment from the April 2016 knee fracture. (Tr. at 52).

Claimant argues that Dr. Alexander's testimony was inconsistent with the evidence that Claimant's physicians highly suspected internal derangement of her left knee, in addition to the fracture, and recommended that she get a MRI, and the fact that she used crutches, wore a brace, and was limited to no strenuous activity or weight bearing. (ECF No. 14 at 12). Claimant's argument is unavailing. As Dr. Alexander testified, Claimant fractured her left knee in April 2016. (Tr. at 740). At that time, the fracture was noted to be highly associated with internal derangement and ACL tears. (*Id.*). Follow-up MRI was recommended to determine if Claimant suffered such damage. (*Id.*). However, there was no evidence that Claimant underwent an MRI and no additional records concerning possible knee derangement or ACL tears. Similarly, a hospital representative wrote a note on the date of the accident, stating that Claimant was limited to non-strenuous activity and no weight bearing, but there were no records documenting a continuing limitation. (Tr. at 478). Dr. Nasher noted that Claimant was using a left knee brace and crutches for several months after the accident, but such notations ended by September 2016. (Tr. at 679, 682, 685, 688, 691, 694, 697). Dr. Nasher's numerous treatment records did not record any abnormal clinical findings regarding Claimant's left knee. (Tr. at 579-716, 797-1033).

In October 2016, Claimant's x-ray showed only possible joint effusion in her left knee, but it was otherwise an unremarkable examination. (Tr. at 486). She had normal range of motion in all of her extremities, and normal gait, stability, and muscle strength.

(Tr. at 495). In April 2017, it was also noted that Claimant had normal gait, moved her upper and lower extremities equally well, and demonstrated no gross neurological deficits. (Tr. at 750). Finally, during Claimant's October 2017 consultative examination, although Claimant complained of tenderness in her left knee, there was no swelling, redness, warmth, laxity, or crepitus, and she had full range of motion in the knee and denied pain with range of motion testing. (Tr. at 773, 776). Her reflexes, sensation, and muscle strength were well preserved. (Tr. at 774). Therefore, Dr. Alexander's testimony that he saw no evidence of residual impairment from the April 2016 fracture, and his other statements concerning Claimant's left knee, are supported by substantial evidence.

### 3. Left wrist

Dr. Alexander testified that Claimant was diagnosed with DeQuervain's syndrome, or left wrist tendonitis, during a single visit with a nurse practitioner, but he noted that there was no evidence of follow-up treatment for the condition. (Tr. at 50-51). In addition, Dr. Alexander discussed that Claimant demonstrated reduced grip strength with her left extremity during her consultative examination, but that the consultative examiner did not document any issues with dexterity. (Tr. at 51).

Claimant argues that Dr. Alexander failed to note Claimant's true muscle loss to explain her decreased left grip strength and omitted the clinical findings of pain, swelling, diminished sensation, and tenderness. (ECF No. 14 at 13). However, there is no requirement that a medical expert discuss every finding in a claimant's medical record in order for his testimony to be entitled to great weight. In fact, if a medical expert's role were simply to recite medical findings verbatim, his opinion would be of little value. In this case, Dr. Alexander expressed medical opinions based on the evidence that he reviewed. He found that, despite Claimant's left wrist impairment and associated signs

and symptoms, there was no evidence that Claimant had issues with dexterity. In other words, Dr. Alexander focused on how and to what extent Claimant's functional abilities were affected by her impairments.

Dr. Alexander's opinion is supported by more than a scintilla of evidence. Claimant lacerated her arm in June 2012. (Tr. at 1071-72). She underwent surgery to repair the affected tendons, but it bears mention that, even at that time Claimant retained full extension, flexion, abduction, and adduction in her left hand. (Tr. at 1068, 1072). In October 2017, the consultative examiner noted that Claimant's left hand grip strength was somewhat reduced at 4/5 due to muscle loss and she had some limited range of motion in her wrists. (Tr. at 773, 776). However, the examiner noted that Claimant could write and pick up coins with either hand without difficulty. (Tr. at 773). In November 2018, Claimant saw a nurse practitioner for left wrist pain. (Tr. at 1051). Nurse Smith noted swelling, pain with palpation and range of motion testing, and decreased sensation. (Tr. at 1053). She diagnosed Claimant with hand pain and tendonitis of the left wrist, but she did not document any manipulative limitations. (Tr. at 1054). Therefore, while Claimant may disagree with Dr. Alexander's assessment of the medical evidence, his opinion that the record did not substantiate more severe manipulative impairments is supported by substantial evidence, and the ALJ did not err in giving his opinion great weight.

### 4. Time period of Dr. Alexander's opinion

Claimant next argues that Dr. Alexander's RFC opinion is unsupported by substantial evidence due to the length of time that it purports to include. (ECF No. 14 at 13). Dr. Alexander explained that he considered the entire time period, including all of the findings related to Claimant's accidents in 2016, the consultative examination, and her diagnosis of DeQuervain's syndrome in 2018, and he found that the evidence

supported that Claimant remained able to perform work at the light exertional level, including walking up to six hours in a workday, with no limitation in sitting or standing, but including specified postural limitations from the date of her alleged onset of disability to the date of his opinion. (Tr. at 52-53). Claimant states that she had "obvious changes" in her impairments over the course of nine years, which rendered Dr. Alexander's RFC assessment unreliable. However, she offers nothing more than her own disagreement with Dr. Alexander's medical opinion, such as contrary medical opinions or other evidence that the ALJ neglected to consider. As shown above, Dr. Alexander's RFC opinion was supported by the longitudinal evidence. Therefore, Claimant's challenge to the time frame of his opinion is without merit.

### 5.  Analysis of the regulatory factors

Finally, Claimant contends that the ALJ did not "engage any of the required regulatory factors" in analyzing Dr. Alexander's opinion, which rendered the ALJ's RFC finding unsupported by substantial evidence. (ECF No. 14 at 13). Importantly, "Fourth Circuit precedent does not require ALJs in all cases to specifically mention or discuss [each] regulatory factor in his written decision." *Cynthia W. v. Saul*, No. 5:18-CV-00102, 2020 WL 2090677, at *7 (W.D. Va. Apr. 30, 2020); *Clark v. Berryhill*, No. 3:18-CV-145, 2019 WL 1461927, at *6 (N.D.W. Va. Mar. 13, 2019), *report and recommendation adopted sub nom. Clark v. Comm'r of Soc. Sec.*, No. 3:18-CV-145, 2019 WL 1460899 (N.D.W. Va. Apr. 2, 2019) ("The ALJ does not need to specifically list and address each factor in his decision, so long as sufficient reasons are given for the weight assigned to the medical opinion."); *Haddix v. Comm'r of Soc. Sec.*, No. 1:14CV12, 2015 WL 1212394, at *5 (N.D.W. Va. Mar. 17, 2015) ("Although an ALJ must consider these factors when weighing the evidence, he is not under a mandate to conduct a factor-by-factor analysis

[…] a logical nexus must exist between the weight accorded to opinion evidence and the record, and the reasons for assigning such weight must be sufficiently articulated to permit meaningful judicial review.") (citations and marking omitted).

Moreover, "[a]n ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies' or has failed to give a sufficient reason for the weight afforded a particular opinion.'" *Clark*, 2019 WL 1461927, at *6 (citing *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015)). In this case, the ALJ's decision demonstrated that the ALJ considered the regulatory factors. The ALJ stated that Dr. Alexander was an impartial medical expert who testified during Claimant's hearing. (Tr. at 15). He discussed that Dr. Nasher, by contrast, was Claimant's treating neurologist and P.A. Adkins performed Claimant's consultative examination. (Tr. at 21-24). Regarding the factors cited by Claimant, supportability and consistency, the ALJ specifically noted the evidentiary support that Dr. Alexander provided for his opinion, and the ALJ discussed portions of the record that substantiated Dr. Alexander's testimony, such as Claimant's consultative examination findings.

Therefore, for all of the above reasons, the undersigned **FINDS** that the great weight that the ALJ assigned to Dr. Alexander's opinion is supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF Nos. 14); **GRANT** the Commissioner's request for

judgment on the pleadings, (ECF No. 15); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: November 5, 2020

Cheryl A. Eifert
United States Magistrate Judge

27